I am Alan Rabinow and with Dwight Peck we represent the appellants in this particular case. Quite recently I heard a discussion regarding the role of an appellate court and what I and not necessarily with justice and fairness. It took me back to a pledge I used to have in the morning as a child in school, and at the end of the pledge I think it went something like with liberty and justice for all. And I believe those words still remain in that pledge. Which brings me to the issue in this case that I hope the court never reaches. And that's the ultimate dismissal in the case for mutinous, because we submit that there were certain fundamental errors that the court made that did away with the case in controversy. But since I cannot guess what the court is going to do, I have to discuss that issue of mutinous. The court, first of all, found that the issue, there was no case in controversy because the court had previously granted summary judgment as to the Section 1983 action. The court then found on the pendant state cases, there was a cap under the Local Government Court Claims Act of $200,000. And this is a case where the life care plan, which we attached to the appendix, is estimated that the future medical care for this individual will be $7 million. In this particular case, the court found that, and we called this in our brief, the other gray case. I submit that many of you know about the Freddie Gray case in Baltimore. Freddie Gray was a case in which there was a settlement of $6.4 million. Now, he was killed. And in this particular case, there is a distinction. The distinction is that Freddie Gray never had to even file suit. Freddie Gray never, in addition to having filed suit, he never obviously had to face a summary judgment motion. You're addressing the Rule 68 offer. The 68 offer of judgment. Of dollars, which is the cap amount in that jurisdiction for this type of action. Were the actions here, the tort claims against this officer, was it in his official or individual capacity? Obviously, it was in his official capacity. He was acting as a trainer in a training course for recruits, police recruits. Well, tell me how the Tort Claims Act works, just to get a little clarification. Yes, Your Honor. Doesn't it substitute the municipality in lieu of him as the defendant, and then says, we are going to be sued only to the extent of $200,000? Not exactly, Your Honor. It's a little different. But the local government Tort Claims Act, under that, and it's very unusual, Baltimore City Police Department is a state agency. So under that theory, we would have an 11th Amendment problem. They would have sovereign immunity. However, for the purpose of the act, Baltimore City Police Department, only for the act. Except the state determines the liability of municipalities. And what I'm getting at, this is not a limitation on a cause of action for negligence. This is a limitation on a suit against the public body, who has to use public taxes to pay for it. And the question is, the whole inquiry is a different inquiry as to whether $200,000 is appropriate. The public municipality or the state don't have to pay anything. The fact, to the extent they give up their immunity in this case, they gave it up to the extent of $200,000. They don't give up their immunity. No, they don't. They maintain the local immunity. The only thing that the act says that they do, they provide a defense and an indemnity up to $200,000 if the acts of the individual officer, in this case, are committed without malice. And notwithstanding that, we only submit that that particular cap is not consistently applied. And I would ask the police if they wish to address the point. Why, if there's a $200,000 cap, was $6.4 million paid in the Freddie Gray case? Yeah, but we can't address the Freddie Gray case. And it seems to me, as you started out, we have to look at the law, whatever the law says here. And I'm trying to explore this Tort Claims Act, which you have to come under. Yes, and Your Honor, we do hope that you don't reach this issue. You don't want us to reach it? I don't. I really don't. That's what you said when you got up there. That's what I said. You don't need to be focused on what is the 1983 claim. And that's what I'm prepared to do, Your Honor. And that is the fundamental error in the case. The fundamental error in the case is the court accepted Officer Kern's assertion that when he shot Raymond Gray in the head, it was an accident. The court said- I thought they were talking about, OK, go ahead. Yeah, when he shot him in the head, it was an accident. That's what Officer Kern indicated. Now, based on that alone, when one indicates that something is an accident or a mistake, that raises the issue of credibility. So when the court fundamentally said, I accept the fact that this was an accident, and therefore there was no intent to bring about a seizure, the court erred right there. The court also weighed the evidence improperly in favor of the moving party as opposed to the non-moving party. The court found that there was sufficient evidence for a jury to find, or viewed in the light most favorable to the non-moving party, that there was a training exercise going on. Raymond Gray was not a member of the Baltimore City Police Department training new recruits, I should say. But he was an employee of the University of Maryland Campus Police at Baltimore. Now, there is a tradition where there are smaller police forces around the state where it is not economically feasible for them to have their own trainers and training class because there are so few trainees. They have an arrangement with the city of Baltimore whereby they pay a sum of money to have their new recruits become members of the class. And on this particular day, Raymond Gray was being trained with that class and was not in any way an employee, as Applee argues, they say he was essentially an employee, not true at all. He was no more an employee if I were, hypothetically, a member of the University of Maryland faculty and they sent me to the University of Virginia to be trained in a class. I would in no way become an employee of the University of Virginia. But that, I believe, they argue at some point. But the evidence viewed by the court as most favorable also was quite strong that no one, no one was to have a live weapon in any training facility. And on this particular day, as part of this, Officer Kern had with him another officer, Officer Edwards. And he was training another portion of that same class in another part of the facility. And he asked, did you do a weapons check? Meaning, did you make sure that your gun is not on you? This is the live gun. It's not on you, that you've separated the ammunition? He could have his gun, but no ammunition. No, he couldn't have the gun. Well, he couldn't have a gun under the policy. No gun. But these guys had agreed they could carry the gun. Well, that's, if you believe, Officer Kern. And that is our alternative theory. OK, but then you're saying that the other officer didn't even agree to that. No. Officer Edwards indicated he didn't agree. Edwards, under Edwards' testimony, they didn't agree to have the gun. Edwards said, yeah, he said that conversation. Edwards' testimony is like most people to you. Edwards, in holding in Kern under the section 1983. Yes, that's true. In fact, well, Edwards also, and it's disputed whether we can get this into evidence, he indicated, and these are deposition testimonies, because we never went to court, and trial testimony, that he felt that Kern was an out-and-out racist. And Kern was, in his white and gray, was an African-American. He testified in deposition he thought it was purposely done, that it was not an accident at all. Would that be admissible? Well, it wouldn't be admissible as a character trait being introduced, that he acted in conformity on that date with that character. But I submit that it could come in, especially on cross-examination, because in this particular case, Officer Kern indicated it was a mistake. And I would submit that for lack or absence of mistake evidence, it could well come into testimony. Furthermore. Come in to cross-examine who? Officer Kern. When Officer Kern would take the stand. But it's the testimony you're trying to get in of Officer Edwards. No, no. Officer, oh, yeah, oh. Edwards says that Kern's a racist. And it might be maybe you can cross-examine Edwards about that, but you can't cross-examine Kern about it. Well, I would submit on credibility, I could, as to absence of mistake. Credibility of Kern? Credibility of Kern. What Edwards thought of him? What Edwards knew about him. He had observed actual conduct on his part. And in fact, he said there were reports. But in any event, the court found that the testimony, and I want to. Do you want us to reverse the rulings as to Kern and Edwards, or just as to Kern? As to Kern and Edwards. Edwards under. As to Kern and Edwards both. Because under Edwards' testimony, he indicates that Kern was not authorized. He never agreed. Under Kern's testimony, he said we did agree. And as an alternative theory under, I think it's rule eight, we're allowed to raise alternative theories. But the court did find that on that particular case, and I want to use the court's words, in reviewing all the evidence, that Officer Kern acted with reckless disregard for the safety of Mr. Gray. He was indifferent to the rights of Mr. Gray. That Kern acted as if such rights didn't exist at all. The conduct was intentional. The intent was not, in the court's view, because the court said it was an accident. But the intent was to cause apprehension or fear that an actual harm was going to occur. I see that my time has. Yeah. I suppose you should go. Tell me, what is the standard that you allege and we should use in your claim on something to due process? If, in fact, the court finds that there was not a seizure under the Fourth Amendment, under the 14th Amendment, we submit that under the component of a denial of liberty because there is a- We've addressed that issue in a couple of cases, that we resisted converting torts into constitutional courts. But we've twice talked about the abuse of employees and so forth. I mean, there are state laws to cover this. And a substantive due process is not intended to reach tortious conduct like this, is it? Well, we submit that this is outrageous conduct because the court actually said that, and my time is up, but may I answer the question?  That no civilized community should tolerate, those were the court's words, I'm paraphrasing. I submit that is even a higher standard that's shocking the conscience. This is not an employee-employer situation, number one. But number two, the level of conduct. Well, you say he's an employee. He is not an employee. He's an employee of Maryland University, not a Baltimore City employee. He is being, we have sued the Baltimore City Police Department, not his employer. We have sued the- So what's the standard if he's not an employee? What is it? I'm trying to understand it. Well, I believe what the judge- You said the harm is what you argued in the brief. Didn't you seem to be going to deliver indifference? Well, it's definitely, there was gross negligence, there's sufficient to find all of that. Deliberate indifference, gross negligence? I only argued intent to harm in the brief. Well, we indicated that the court did find that the conduct was such that no reasonable community should tolerate it. While we might not have cited a case precisely on point, we did raise that point. Thank you. Mr. Glenn. May it please the court. My name is Colin Glenn, and I represent all of the defendant appellees. The case before you concerns a tragic workplace training accident. Ordinarily, this would be properly resolved- You want to just keep your voice up? I'm sorry.  resolved through state tort law and workers' compensation. This appellant plaintiff is attempting to shoehorn his case into a 1983 constitutional case alleging violations of federal constitutional rights, the Fourth Amendment and the Fourteenth Amendment. The lower court, the district court, rejected that attempt. And as I will explain, I asked the court to affirm the lower court's ruling. At the core of this case, there are three issues on appeal. First, we have plaintiff's Fourth Amendment constitutional claim alleging a seizure. We also have plaintiff's Fourteenth Amendment claim alleging a violation of substantive due process. And then we have a variety of state law claims that the lower court addressed in various ways because of the timeline on which the motions came before the court. But ultimately, all of those claims are subject to the Local Government Tort Claims Act. And all of those claims are because of the payment of money to the clerk's office that was done by one of the defendants. All of those claims are moot. And the lower court had no jurisdiction to hear any of those claims. Now, turning to the plaintiff's Fourth Amendment claim, there's this court in Rucker v. Harford County explained a plaintiff bringing a 1983 action alleging a unreasonable seizure must prove that they were the intended object of a physical restraint by an agent of the state. He aimed the weapon at him. Yes, he did. He pulled the trigger. Yes, he did. And he hit him. Yes, he did. So that was no seizure in your view. The requirement in Rucker for there to be a seizure is that there to be an intent to seize. As Rucker explained, the fact that the action itself was intended is not sufficient. It is necessary that the actor intend that the subject be seized. Here, isn't the Fourth Amendment applied almost exclusively? There could be hypotheticals that go beyond this. But in law enforcement context, investigatory in law enforcement type of context. Exactly, Judge Niemeyer. As I was about to say, almost all of the Fourth Amendment cases that we have that address seizures are law enforcement cases where contextually it's obvious whether or not the officer involved, or the sheriff, or whatever it is, was intending to seize someone, intending to arrest someone, intending to receive. Bringing them in the custody of the governmental body, whether it's a state, or a city, or a federal government. Exactly. Seizure is that effort. You can have some context. I would suspect in a civil context where they make arrests, one thing I thought of might be, for instance, if somebody was driving an Amtrak train and had crashed, and was suspected of having been drinking, and so forth. And the Department of Transportation agents come up and seize him. That still may be an arrest for law enforcement. But if two officers have a spat at a bar, and one shoots the other, that's not a seizure. That's something else, but it's not a seizure. They're not trying to enforce the law and bring somebody in the custody of the state. Exactly, Jeff. And I don't think this was an effort to bring him in the custody of the state. It was a shooting. It was a shooting, but it had nothing to do with law enforcement seizure. Well, he was in a training program. Exactly. And I thought the officer said he was trying to teach him. So, exactly. He was the instructor, and he was trying to teach him. He said, I wanted to teach him. He said, I wanted to teach him. He didn't say, I wanted to teach him. That's what instructors do, teach. He wasn't there in the context of interacting with the public. He wasn't permitted to have his firearm. He was effectively a civilian. He was there as an instructor, not there as a police officer to effectuate law enforcement purposes. Well, even the shooting, you weren't trying to bring him into custody. Not at all. There's no evidence of that. And so, there are cases cited by plaintiffs, like, for example, Henry V. Purnell. Cases in terms of mistaken use of excessive force. There's a civilian? I'm sorry, say that again? There's a civilian? Did I hear that? I'm not saying he was there as a civilian. I'm saying he was effectively there in the sense that he wasn't there to effectuate law enforcement. He's more than a civilian, isn't he? I mean, he's got these weapons on the side of him. They're carrying him around. They authorize him to do so. They're not on the University of Maryland campus. Isn't he more than a civilian? He is officially a police officer at the time, but he was not permitted to be carrying his service weapon. He was only permitted to be carrying a training weapon that is non-lethal. He was not there to function as a police officer, and he was in an enclosed space at a facility outside of his own jurisdiction in Baltimore County in the Rosewood Medical Facility, which is an old, closed down. Not permitted to carry the weapon, but that prohibition arises from Baltimore? Yes. Not from Maryland? The record was not totally clear on exactly how the training rules worked. My understanding from the testimony of Officer Edwards is that he was prohibited from carrying the weapon under Baltimore Police Department training regulations. He carries the weapon. He carried the weapon in violation. Incident occurs that occurs in sort of strong reason as to why that rule is there that you don't carry a weapon. He actually draws the weapon, and someone tells him, you just do your weapon. Yes. And then he puts it back as though nothing happened, and then he goes and does it again. He was monumentally stupid, and stupidity, however. If we're talking in terms of level of intent here, does willfulness have a role in this? When you say willfulness, in the criminal context, repeated conduct can be the basis of willfulness. You still have that in the black suit case, but that's not the record I'm pointing to, but I'm just dealing with it in terms of the willfulness here. Here, the facts are pretty keen. You've got a law. You tell me he's not even supposed to have this gun. He nonetheless carries it. That's his act. He decides to do that. And in doing it, he then carries out the very thing that the law proposes there, why you're not supposed to have it. He does it anyway. And then once he does it, he keeps it on. Then he puts himself in a situation where he's going to teach a lesson. Did he see the individual that he shot? He testified that he saw the individual through a window. This particular individual? I believe so. Was his intent at that time to fire the, not the gun, but the other weapon at this particular individual? I believe he was intending to fire it at the door, because he knew that individual. And the other, there would have been, I believe, three potentially officers involved in the training exercise they were working on. But that his intention was to fire it at the door to alert them that they were standing in a dangerous place. Are these weapons pretty similar? When you say similar, do you mean physically resembling one another? It seems like, typically, if you're dealing with a Taser gun, which we've dealt with in other cases, they're very different from a gun to some extent. There are a lot of similarities. But the two here, are they similar? That it's easier to mistake them like this? The weapons themselves, I haven't seen photographs of them. But the testimony is that the service weapon was a Glock 22, that the training weapon was effectively an exact duplicate physically, except that the handle was colored a different color. And otherwise, they were the same, which makes sense in a sense. In a blue handle. In a blue handle, but it makes sense in a sense that they're very, very similar. Yes, they look alike. They were made to look alike. They were made to look alike. It's part of the training so that you're used to firing a weapon that you're already going to be trained on. How many were in the hallway that he shot at? The area he shot at? How many people? I am not sure exactly how many people were in the hallway. The testimony was that there might have been three, Officer Edwards said. But I'm not sure. Can you tell us what it is in the light most favorable to the non-moving party? Those are the facts we've got to take here. I understand. And the light most favorable is, I'm not sure. It's not clear as to how many. There may have been more than one. But I'm not sure how many other officers. Those are more favorable to the plaintiff to have three or to have one. I don't know. The plaintiff has to look at the facts in the light most favorable to the non-moving party. He's entitled to that. He's entitled to that. He hasn't argued that. So I haven't given a whole lot of thought to that. That's the standard for summary judgment. Exactly. But I mean he has facts are, let's ascertain the facts in the light most favorable to the non-moving party. And those are the facts we have to look at. He would probably say that he wants it to be just one person. He what? He probably would say that he wants it to be just one person. But I won't speak for him. But you stated that he, the officer, intended to fire, not the gun, but at this particular individual because he knew he was there. I think that the evidence would suggest under the most favorable standard that he was intending to alert specifically Mr. Gray. And that was the person he saw. What was the ammunition that comes out of the blue-handled gun? Is it paint? It's something like a paintball. I've not seen it or fired it personally. But something like a paintball, the testimony was that it would have an impact with you. And it might leave bruising or something like that. And it would leave a paint mark. But I've not seen it personally. And there wasn't a whole lot of testimony on it on the record. But that it would have been less than lethal, though obviously for safety purposes they wear equipment to protect themselves. And hit him in the head? Yes. Hit him in the head. And he's disabled for life? I'll let his counsel explain all the details of his medical condition. It's my understanding, yes, that he's disabled for life. But yeah. I just want to make sure I understand you the way you've given the facts. And that is that the individual, there was definitely a policy against him doing this. He chose nonetheless, along with his clerk, to arm himself in conjunction with the gun that would shoot the so-called paintball. That was not something he should have done. But he did it deliberately. And then he had an incident. It's undisputed. He had an incident with this same individual. This same individual, Gray? I don't believe the record was that it was the same individual. I thought it was a different trainee. But I can't promise. So it wasn't Gray that he pulled the gun on and then they say? No, I don't believe it was. I believe the testimony was that he pulled the handgun in order to show something about the handgun to a different trainee just to show him. And the trainee said, oh, you've got your service weapon. I guess he could see the handle. So you're saying he pulled it deliberately? That he drew the handgun deliberately that time? He drew the weapon, realized that it was the wrong weapon, and then holstered the weapon after the trainee corrected him. And then later on, he then again drew the wrong weapon. Yes. In this incident, for this particular plaintiff here. But he was not involved, but was the plaintiff involved in the first instance at all? I don't believe so. But he wasn't around a little bit? I don't believe the record places him at the scene of that. But I'm not sure that's never been raised before. But no, there are very good reasons why the rules are what they are. He violated the safety rules. The exact predictable result for why that rule existed happened, which is you don't bring your firearm onto the scene because an accident could occur. And you could accidentally draw that weapon and injure someone. And that is the tragically horrible result that happened here. And the question is, what is the appropriate legal way of resolving that? Plaintiff wants to call this a constitutional claim. Plaintiff has collected workers' compensation through his employer in some amount. He can say what it is now. But some amount greatly in excess of the Local Government or Claims Act cap. And otherwise, he would have some state law claim, except that the Local Government Tort Claims Act has been exceeded. And although he tries to argue in his brief that the Tort Claims Act is unconstitutional under the Maryland Constitution and that he should be allowed to collect a state law tort claim in excess of it, that has been firmly concluded as not true under the Maryland State case of Espino. He could, I guess, if he could show actual malice. Is that right? If he could show actual malice and had evidence of actual malice, which amounts to an intention, a willful intention that is marked by hate, then he could pierce the Local Government cap only for purposes of defendant Kern, the actor. So there's evidence of that is this is a racial thing because there's testimony that he has eminence generally against African-Americans shown by several incidents, including the EEOC complaint and other things there. And that's the evidence the plaintiff is showing to say, once you have this individual, you say he does, in fact, know that's the individual when he pulls that so-called taser like gun on him and mistakenly used the other after he's done that before. That is plaintiff's evidence. His claim is that he wants, as I would describe it as, he wants to manufacture malice against this particular plaintiff. Not just plaintiff's evidence. That seems to be what you just told me, the evidence. But you say that does not amount to malice. It does not amount to malice. And the evidence that he wants to use in terms of What would it? Would it elevate the malice if, in fact, there was evidence that he was specifically going after this particular individual? If there was some evidence that he was specifically targeting this individual? I don't know what that would look like. We don't have anything like that. He wants to shoot him. If he said, I'm going to go shoot that guy. That would get there. I would take it. I have. Well, that's murder. If he outright says, I'm going to murder this guy. Well, I understand that. But we're not going to go to murder, because we don't need to put it to murder. That's part of premeditated murder type situation. Malice is definitely something less than that. That's where I'm getting with that. That's exactly correct. I don't think you need premeditated murder to get the malice. I'm not saying that. The question is, if he does it, he's looking at this individual. He sees him. He knows that he's already made a mistake pulling the wrong gun. He knows that's against the policy to have it. And nonetheless, he does it to teach him a lesson. And he shoots at it. He's definitely intentionally shooting at it. But the only thing about it, he says it's an accident. The accident is in the selection of the gun. Is that the accident? He should not have fired the weapon. That was in violation of the law. But is that the accident? When we say accident, is that the mistake is in pulling the gun? I suppose when you say the word mistake, we invite multiple interpretations. He made a mistake in bringing it. The question is, when he pulled the gun, he pulled the wrong gun. That was the accident, right? He absolutely pulled the wrong gun. And that was accidental. Why don't you just say yes? He made a lot of accidents like that. You're taking it very candidly and saying things straight up. I'm just asking you. I understand. The reason I'm asking you is because when you're dealing with that's the accident or the mistake, he's done it before. There's a rule against him doing it. And he knows that you can make that mistake. And it's a deadly mistake. It's not one of those little things where you make a mistake, oh, no big deal. I just shot him with a paintball instead of just making a sound. It's a gun. And it's something he has no business having on. And he knows he's pulled that thing before. And he does it intentionally, even though his mistake is pulling the wrong one. Everything else is intentional. Everything else is intentional in his actions. That has to be correct. It's intentional that he's shooting. It's intentional that he wants to shoot. And his intent, he's going at this particular, only thing that's a mistake is the gun he pulled. But he's already made that mistake once. How many times are we going to let him do that? How many times could he be in a situation where he just continually keeps pulling his gun? And I say he's done it 10 times. Every time he goes, oh, man, I made a mistake again. Man, you keep making these mistakes all the time. Finally, he does this. Is that malice? Is it malice? I would say no. I think when you think about the due process. He knew he had the real weapon on him. He knew he had the weapon on him. And under his version of the facts, he had the approval of Edwards. He says he has to say that. Well, you want us to believe that, don't you? As far as Mr. Kern is concerned, you have to. As far as Mr. Kern is concerned? You have to. Even though you've got a conflict in telling us to believe that, because Mr. Edwards told him that you represent both of them. Right. Right. But as to Kerns, that's his explanation. It is his explanation. I had approval for having it on there, because Mr. Edwards told me to. But as to Mr. Edwards, to exculpate him, you've got to argue that Mr. Edwards told him not to have it. He didn't approve it. Well, that's your position on Edwards. That is my position on Edwards. It has to be your position for Edwards. Though my position on Edwards also is that the claims he He didn't approve the guy having the weapon, because he told him not to. So there is direct conflict. In that particular instance, there is a conflict in the record. My position on Edwards is also that the claims against defendant Edwards are closed based on the Local Government Court Claims Act, in terms of the negative. I'm talking about the 1983 case. Well, 1983 would require some much higher degree of mental state than the state law claims. There's no evidence in the record that defendant Edwards was deliberately indifferent, or in this case, assisted intentionally. Well, under your man Kerns' testimony, he approved Kern having the weapon that he shot the guy with. He approved him carrying it. He told him he could have it. He does suggest that they agreed on that. He told him he could have it. That takes care of it. He does say that. So I'm looking at the transcript. I'm trying to get back this earlier version. I'm on 298 to 299. Take a look at it and let me know. The first time, he says, Officer Kern had pulled his weapon from underneath his blouse and pointed the weapon at Officer Gray. Isn't that the same guy? Oh, I said I didn't remember. And apparently, he says it was that. Isn't that significant? He pulls his weapon out at this very same guy. He's already done it to him. He turns around, and the second time, he pulls up. It certainly suggests that he was very careless that day. That's all it is. That's my position. Suggests carelessness. And that's the problem at the heart of this case, which is under slaughter, this court's ruling on due process, it takes a deliberate intent to harm in order to implicate the 14th Amendment. It is not enough for negligence. It is not enough for deliberate indifference. He must deliberately intend to harm Mr. Kern. There's no evidence that Mr. Gray There's no evidence that Mr. Kern deliberately targeted Mr. Gray, or had any personal animus against him, or was otherwise motivated to injure anyone. The fact that he is careless is horrible. It almost reminds me of in the civil action, you know, you can have a dangerous infantality around, and you don't intend to hurt anybody, but someone gets hurt. You could, it's like, it's not quite as the same as throwing a grenade out in a crowd, but I didn't, I just wanted to scare him. But you know this can do greater harm. He has this gun, a gun on his side of him. He's already pointed at this particular individual. Evidence all through the record there that he has this animus toward African-Americans. He happens to be African-American. I'm not saying it goes there completely, but I'm just saying it is there. And all of a sudden, you tell me he's looking down his hallway, he is pointing directly at Mr. Grape. It's intentional that he wants to shoot that so-called paint gun at him to teach him a lesson. And he's done this before, and now he's done it now again. This time, he ends up in a tragic situation. All right, Mr. Glenn. We'll hear from Mr. Rabinow. Thank you, Your Honor. Thank you, Your Honor. Before I answer any questions, if the court may have any, I would just like to make two observations. Number one, the slaughter case that was just mentioned is not applicable. That intent to harm is a standard applied between an employee and an employer. Slaughter was a fire recruit in a purposeful burn. And although there was some recklessness, perhaps carelessness, the intent to harm was the standard applied to her employer. But in this case, it is not an employee-employer situation. What do you think the standard is? The standard for what, Your Honor? The standard, you said it's not intent to harm. What is it? Well, as far as the 1983, the standard is what Judge Scalia said in Brower. It's a termination of freedom of movement by means intentionally applied. And that definition, it partly answers Judge Niemeyer's question or statement regarding a fight in a bar. Would this not be more like this? But in the fight in the bar between the two police officers, first of all, it's not under the color of law. It's not scope of employment. And in addition to all of that, So you would help me out if you differentiate between a seizure claim and a deceptive due process claim? Yes, well. That's the confusion I'm getting on it. When you're dealing with due process claims, your argument seems to be intent to harm. I don't know how you get the deliberate indifference with an employee-type, non-employee-type situation. Yes, Your Honor. And I can only say in reading a lot of these cases, the more you read, the more one gets confused, because there are so many divergent views. With the particular claim that you're addressing, if you're dealing with seizures, one thing is the deceptive due process, and the other thing. They're too independent. If, in fact, there is a seizure under the Fourth Amendment, the court never reaches the Fourteenth Amendment. The Fourteenth Amendment, under the substantive due process component of the Fourteenth Amendment, I submit it's the Fourth Amendment, because. So are you willing to stick with the Fourth Amendment? If you want to give it to us under the Fourteenth. You've got the Fourth, right? Don't even get there, Your Honor, because you only get there if, in fact. After you answer that question, not if you want to get there. Judge King asked you, is that your better argument? Yes. Unequivocally. And to go. Well, that's somewhat curious, because I can tell you that would be the greatest outlier under the Fourth Amendment. The Fourth Amendment is denying searches and seizures. And searches and seizures are in connection with law enforcement and the state taking custody of somebody and taking custody of his property and his person. That's not this circumstance. That wasn't even involved here. This is a training session. This is not one person trying to take custody of the other. It's a total misuse of search and seizure. And you can get me a case where somebody is not doing law enforcement or in connection with law enforcement. I'd like to see it. But we submit that under the Brower case, it does. Because it's parsed language, you have to understand these cases. And the fact is that all of these cases where we address searches and seizures, it's where the state, through some person on behalf of the state, is seizing somebody who has freedom in the community. And for the purpose of taking them into custody, it's a seizure. Now, when you shoot somebody, one person shoots another, and he's not trying to take them or hold them. The shooting has to be incidental to taking somebody. If you're shooting to punish them, or you shoot them because you have a brawl, that's an assault. It may be murder or whatever it is. But it's not a constitutional Fourth Amendment issue. Your Honor, with all due respect, we submit that the term should be a restriction of the freedom of movement. That there does not necessarily have to be. But it has to be a state restriction on the freedom of movement for the purposes of some purpose of intending to restrict the freedom of movement. We have here an officer picking out the wrong gun with the intent to make him realize he's in a wrong area. He's exposed to danger, and he wants to shoot the door with a paint gun. He's not trying to take him into custody or take away his freedom. He's trying to scare him or to bring him to some realization that he's in the wrong spot. But the Fourth Amendment, Your Honor, addresses. I don't know how we would ever write out the Fourth Amendment issue on that. I mean, I personally think if you're going to pick amendments, you better pick the 14th. That wasn't the original question, with all due respect. The question was, which would you rather have? Exactly, you said the Fourth Amendment. I'd rather have it. I think that's a toss away. Well, then we have to go to the Fourth Amendment, and you can argue it. Well, the Fourth Amendment, based on an abuse of authority, and clearly in this case. No, it is not. You abuse somebody's authority, you're not seizing them. I would submit that in Broward, Justice Scalia did use that word. You say it doesn't apply to these facts. No, you seize people for certain purposes. I mean, you shoot people for certain purposes, but the ultimate purpose is to seize them. That means to take custody of them. And so when you shoot somebody in order to seize them, or arrest them, or bring them in custody, or to talk to them, or whatever it is in connection with law enforcement, you're seizing them, illegally under the Constitution, or legally. That's always the issue. But when you just shoot somebody with no intent to do that, you're just shooting them to punish them. Or you want to scare people away from the crowd, you fire this so the crowd scatters. And a bullet happens to hit somebody, that's not a seizure. But he particularly targeted this individual. But not to bring him into custody or seize him. Well, to create fear in him. Exactly. Which is not a seizure. Your Honor, I would move on to the 14th, obviously. I think you'd do much better myself. Now, Judge King may say, stick with the fourth. I might tell you to stick with the fourth. It's just like one of these basketball charts. I haven't disagreed with Judge Debrow on a lot of things, but I may disagree with him wholeheartedly on this. Well, thank you. But you don't know that. I really don't. Thank you. With regard to that. I'd suggest you take your own counsel. I should have Mr. Pettit come on. 14th Amendment, deprivation of liberty is what we submit. What was the constitutional violation? That one, you're facing our way bright decision, where when you have the possibility of a tort or a constitutional violation, we've said you have to pursue the tort. And I'm not sure how you handle that. But it seems to me there's a strong presumption against constitutionalizing torts. That's what we said in that case. Well, I do understand that. And if I just might comment on that, and then my time is up. We submit that the conduct is so outrageous in this particular case. The courts have used, in what Your Honor was referring to that situation, does it shock the conscience of the court? And we submit that the evidence even viewed by this report below. That doesn't address my point. My point is, if you have a tort that addresses the conduct, then we push that into the tort law. We don't constitutionalize all the common law. And the strong preference that we expressed in way bright is to handle it under the tort law if it's going to be covered by tort law. And then you'd still have to satisfy the very high bar of substantive due process, where the Supreme Court has really put the brakes on. Basically said, we're not going to extend it any further anywhere. They're very, very reluctant to apply substantive due process. May I just respond to that one point? We would submit that the state remedy is so inadequate as to offer no remedy at all. And that's why we would say we'd have to go the constitutional route. Thank you. Thank you. We'll come down in great counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.